UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL MOORE, LISE
Y. MOORE, SABRIA MOORE,
and JALIA GRAHAM,

                    Plaintiffs,

          -v-                                   5:16-CV-1230

MICHAEL KELLER, MICHAEL
JORGENSEN, and JOSEPH NAPPO,


                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                           OF COUNSEL:

SIDNEY P. COMINSKY, LLC                 SIDNEY P. COMINSKY, ESQ.
Attorneys for Plaintiffs                SYLVIA BODE KRAUS, ESQ.
1500 State Tower Building
Syracuse, NY 13202

HON. LETITIA A. JAMES                   AIMEE COWAN, ESQ.
New York State Attorney General         Ass't Attorney General
Attorneys for Defendants
300 South State Street, Suite 300
Syracuse, NY 13202

DAVID N. HURD
United States District Judge

**MEMORANDUM–DECISION and ORDER**

## I. INTRODUCTION

       On September 19, 2016, plaintiffs Michael Moore ("Michael"), Lise Y. Moore ("Lise"),

Sabria Moore ("Sabria"), and Jalia Graham ("Jalia") (collectively "plaintiffs") filed this civil

rights action in Supreme Court, Onondaga County, against defendants SUNY Upstate

University police officers Michael Keller ("Officer Keller"), Paul Daugherty ("Officer Daugherty"), Michael Jorgensen ("Officer Jorgensen"), Joseph Nappo ("Officer Nappo"), public safety officer Stephen Mauser ("Officer Mauser"), and registered nurse Julie Sunser ("Nurse Sunser").  According to plaintiffs' ten-count complaint, these defendants violated 42 U.S.C. § 1983 and related state law when they forcibly prevented Michael from leaving Upstate University Hospital ("SUNY Upstate" or the "hospital") and then arrested his wife and children when they tried to intervene on his behalf.

On October 11, 2016, defendants removed the action to federal court and answered the complaint.[1]  Dkt. Nos. 1, 4.  Before discovery commenced in earnest, plaintiffs moved to remand the case to state court based on their contention that, *inter alia*, the state law claims presented novel and complex questions under New York's Mental Hygiene Law.  Dkt. No. 10.  After oral argument, that request was denied.  *Moore v. Keller*, 2017 WL 3822053 (N.D.N.Y. Aug. 31, 2017).  Thereafter, the parties completed discovery and stipulated to the dismissal of all claims against police officer Paul Daugherty, public safety officer Stephen Mauser, and registered nurse Julie Sunser.  Dkt. Nos. 63, 67, 68.

On April 22, 2020, Officer Keller, Officer Jorgensen, and Officer Nappo (collectively "defendants") moved under Federal Rule of Civil Procedure ("Rule") 56 for summary judgment on all of plaintiffs' remaining claims.  Dkt. No. 72.  The motion has been fully briefed and will be considered on the basis of the submissions without oral argument.

---

[1]  Mauser answered the complaint at a later time.  Dkt. No. 30.  A suggestion of death was filed for this defendant on September 16, 2019.  Dkt. No. 55.  The claims against him were later dismissed by stipulation.  Dkt. Nos. 63, 64.

## II. **BACKGROUND**

The story of how Michael and his family ended up at the hospital starts with two car crashes.  On June 4, 2013, at about 4:35 in the afternoon, Michael rear-ended a driver at a stop sign.  Defs.' Rule 7.1(a)(3) Statement ("Defs.' Facts"), Dkt. No. 72-1 ¶¶ 4-5, 8. According to Michael, the collision happened because the brakes failed on his pickup truck.[2]  *Id*. ¶ 6; *see also* Ex. P to Cowan Decl. ("Michael Dep."), Dkt. No. 72-17 at 42.[3]

Michael gave the other driver his insurance card, but he did not stick around to give the police his version of the story.  Defs.' Facts ¶ 8.  Instead, Michael left the scene of the first accident and promptly got into a second crash.  *Id*.  By that time his truck was totaled, so Michael left the scene of the second accident and walked home.  *Id*. ¶¶ 9-10.  Michael's odd behavior could probably be explained as the symptoms of a concussion—he would later testify that he banged his head on the driver's side window during the second crash.  Defs.' Response, Dkt. No. 82-3 ¶ 177; Michael Dep. at 51.

When he got home, Michael immediately went to bed.  Defs.' Facts ¶ 11.  The next morning, his wife Lise could not get him to wake up.  *Id*.  Alarmed, she called one of Michael's friends over to try to wake him, but Michael's friend did not have any more luck rousing him than she did.  *Id*. ¶ 12.  So Lise called an ambulance, which took Michael to SUNY Upstate.  *Id*. ¶ 13.  Michael remained unconscious in the hospital's ICU for several days.  *Id*. ¶ 14.

On June 7, 2013, Michael finally woke up.  Defs.' Facts ¶ 15.  He was disoriented and

---

[2]  In a police report generated for the incident, the other driver described Michael as "intoxicated."  Defs.' Facts ¶ 7.  Plaintiffs dispute this fact as irrelevant.

[3]  Pagination corresponds with CM/ECF.

confused, and could not remember much about what had happened.  *Id*. ¶¶ 15-16; Michael Dep. at 45, 51.  Although Michael's condition seemed like it might be due to injuries from one or both of the car accidents, Lise, who worked in administration at another hospital nearby, had talked to her co-workers and become concerned that maybe something else was going on with her husband—she had found "an incoherent note" in the bedroom written by Michael that, according to defendants, "implied he had taken a drug overdose" in a possible attempt to commit suicide.  *Id*. ¶ 18; *see also* Ex. Q to Cowan Decl. ("Lise Dep."), Dkt. No. 72-18 at 26-27.

The "incoherent note," whatever it actually was, has since disappeared.  Lise Dep. at 28.  And Lise herself quickly dismissed the idea that her husband had tried to hurt himself or anyone else.  *Id*. at 27-29.  As she explains, she was not even sure whether Michael had written the note right around the time of the car accidents or if it had been there for a while already.  *Id*. at 27.  But she *did* tell the staff at SUNY Upstate about this "odd scribbling" when Michael was unconscious in the ICU, since in her telling the note seemed a bit out of character for him.  *Id*. at 26-27.  This seemingly innocuous bit of information was duly recorded by the hospital staff, which helped set off the chain of events that eventually led to this lawsuit.

Upon awakening, Michael was seen by Dr. Ramamurthy, a psychiatrist, who noted that Michael appeared confused, unfocused, and unengaged.  Ex. I to Cowan Decl., Dkt. No. 71-10 at 2.  Dr. Ramamurthy opined that all of Michael's symptoms might well be explained on the basis of a head injury or concussion from the car accidents.  *Id*. at 3.  However, Dr. Ramamurthy went on to speculate that an overdose and attempted suicide might be a possibility, too.  *Id*.  In support of the idea that Michael had experienced possible suicidal

ideation, Dr. Ramamurthy's treatment note included a reference to the so-called "suicide note" found by Lise and recorded by hospital staff in Michael's medical chart.  *Id*. at 1.  And it turns out that an initial test of Michael's urine had suggested the possible presence of benzodiazepines, a controlled substance.  *Id*. at 3-4.

Dr. Ramamurthy concluded that more testing and observation was warranted before making any firm conclusions about the underlying cause of Michael's disoriented condition.  Ex. I to Cowan Decl., Dkt. No. 71-10 at 3-4.  As relevant here, Dr. Ramamurthy's examination note instructs:

> Please do not discharge this patient.  He does not have the capacity, at least now, to make a decision about going home.  Even when he becomes more coherent, he will need to be assessed for suicidal ideation.  Thus, he cannot go home then, either, until we have clarified the course of events.

Defs.' Facts ¶ 20.

That evening, Michael was transferred out of the ICU and into a regular room on the sixth floor of the hospital.  Defs.' Facts ¶ 22.  Michael and Lise were joined there by Sabria and Jalia, his two teenage children.[4]  *Id*. ¶¶ 2-3.  Before long, however, Michael objected to an aide the hospital had assigned to follow his every move.  *Id*. ¶ 26.  According to Lise's deposition testimony, her husband wanted "to take a bath and go to the bathroom," but the female aide insisted that "she had to go with him."  Lise Dep. at 35-36.

The parties agree the aide was there in accordance with SUNY Upstate policy, which required a patient to remain under "one-to-one constant observation" when they are under a "Suicide Precaution."  Defs.' Facts ¶ 24.  This intrusive arrangement frustrated Michael, who

---

[4] Lise is Sabria and Jalia's stepmother.  Michael also has a son who was present at the hospital for some of these events, but he does not seem to play a role in this suit.

eventually asked to leave the hospital. *Id*. ¶ 28. According to defendants, Michael was not free to leave the hospital because of this Suicide Precaution. *Id*. ¶¶ 23, 25. Plaintiffs, for their part, contend that the hospital had not validly placed Michael on a suicide watch or hold because the hospital's staff had not followed certain procedures required under New York law. *See* Defs.' Response ¶ 188-90.

In any event, Michael tried to leave the hospital at this time. Defendants contend that Michael and Lise began making a scene, yelling and causing a disruption that could be heard by other patients nearby. Defs.' Facts ¶¶ 29-30. Plaintiffs dispute this characterization of their behavior, but acknowledge that they were frustrated by the lack of clear answers about Michael's situation and the intransigence of the hospital staff. Pls.' Response ¶¶ 27, 29-30.

At about 7:47 p.m., registered nurse Jennie Pharaoh ("Nurse Pharaoh") called security for help. Defs.' Facts ¶¶ 21, 31. SUNY Upstate police dispatch initially sent Sergeant Frank Barrett ("Sergeant Barrett") to respond. *Id*. ¶ 33. Sergeant Barrett is employed by Securitas, a security company hired by SUNY Upstate to provide public safety officers for the hospital. *Id*. ¶¶ 32-33. Upon arrival, Sergeant Barrett observed that Michael and his family members were "agitated" with the nursing staff, who were doing their best to prevent the family from leaving the sixth floor. Pls.' Response ¶ 33. Sergeant Barrett called for backup. *Id*. ¶ 34. SUNY Upstate police dispatch relayed to University Police that a "high risk" patient was trying to leave. Defs.' Facts ¶ 35.

At about 7:51 p.m., defendants Officer Keller, Officer Jorgensen, and Officer Nappo arrived on the scene. Defs.' Facts ¶ 36. Hospital staff told the three officers that Michael "was on a psychiatric watch, [had been] assigned a safety companion [an aide,] and [ ] was not allowed to leave the hospital." *Id*. ¶ 40. This development did not do much to improve

anyone's mood.  Pls.' Response ¶¶ 43-46.  Eventually, however, a nurse managed to explain

to the family that Michael could not leave the hospital yet because (a) he was on suicide

watch and (b) a psychiatrist had not evaluated him.  Defs.' Facts ¶¶ 48, 55.  The family

agreed to wait to speak to a psychiatrist, since they believed this person could have the

suicide watch lifted.  Pls.' Response ¶ 56; Defs.' Facts ¶ 57.  The University police officers

and other security staff considered the situation resolved and left the area.  Defs.' Facts ¶ 59.

A few hours later, the family finally met with psychiatrist Dr. Nisha Warikoo and Nurse

Pharaoh.  Defs.' Facts ¶ 60.  Michael and Lise wanted the Suicide Precaution lifted so that

he could be discharged from the hospital, but Dr. Warikoo wanted to keep Michael under

observation for a while.  *Id*. ¶¶ 61-62.  Importantly, however, plaintiffs assert that Dr. Warikoo

told them "she did not have the authority to keep them there if they wanted to leave."  Pls.'

Response ¶ 63.  As Lise testified in her deposition:

> [T]hey said maybe she could discharge you after you talked to her.
> So we sat there, and we were in the hallway and there was like a
> little corridor, and that's where we were with the police still hanging
> out in the hallway, and the aide.  And we were there until about 10
> or 10:30 when the Psychiatrist came.
>
> When she came she brought us into a room and talked to us
> about 10 or 15 minutes.  And told Michael, she said, you more than
> likely probably have a concussion, but I would think it would be
> better for you to stay here, but I can't stop you from going.  So he
> said, fine.  And so we got up and we walked out.

Lise Dep. at 37-38.

As Lise testified, the family left this meeting and immediately headed toward the sixth

floor elevators.  Defs.' Facts ¶ 63.  Nurse Pharaoh called security again.  *Id*. ¶ 64.  This time,

Officer Mauser responded.  *Id*. ¶ 65.  Officer Mauser's report indicates that he arrived to find

the family arguing with Nurse Pharaoh.  Pls.' Response ¶¶ 66-68.  When a nurse blocked the

elevators, the family headed down the stairs.  Defs.' Facts ¶¶ 70-71.  Officer Mauser called for backup and followed the family into the stairwell.  *Id*. ¶¶ 69, 72.

Although the family meant to exit onto the first floor, they ended up on the second floor of the hospital by mistake.  Defs.' Facts ¶ 71.  By this time, Officer Mauser had caught up with them near the elevators and tried to block Michael from leaving.  *Id*. ¶ 73.  The situation escalated from there.  SUNY Upstate police dispatch directed defendants Officer Keller, Officer Jorgensen, and Officer Nappo to the second floor, having advised them that Michael was not cleared to leave the hospital.  *Id*. ¶¶ 76-77.

Security camera footage offers a partial window into what happened next.[5]  Ex. F to Cowan Decl. (traditionally filed with the Clerk's Office).  Defendant Officer Jorgensen caught up with Michael, Lise, Sabria, and Jalia outside the second-floor elevator bank.  Defs.' Facts ¶ 80.  He advised Michael that he could not leave the hospital and that he needed to go back to the waiting area on the sixth floor.  *Id*. ¶¶ 85-86.  When Michael and his wife attempted to walk past defendant Officer Jorgensen, the officer grabbed Michael's wrist.  *Id*. ¶¶ 87-88; *see also* Ex. F to Cowan Decl.

The parties dispute the firmness of defendant Officer Jorgensen's grip and his choice of technique, but everyone agrees that Michael fell right to the ground in front of one of the elevators as a result of this physical contact.[6]  Defs.' Facts ¶ 89; Pls.' Response ¶¶ 88, 91.  Defendant Officer Jorgensen called for medical assistance.  Defs.' Facts ¶ 92.  Defendants contend that Michael appeared unharmed, *id*. ¶ 94, but Jalia testified that he "kept saying his

---

[5]  The footage has no audio and is of relatively low quality, but to the extent certain events can actually be gleaned from reviewing it, they are characterized in this background section in the light most favorable to the non-movants.

[6]  The footage appears to depict Michael's shoes or slippers flying off.

back hurt and he was in pain" and Lise testified that he was "screaming, help me, help me." Ex. S to Cowan Decl. ("Jalia Dep."), Dkt. No. 72-20 at 63; Lise Dep. at 48-49.

The situation continued to deteriorate.  Officers pulled and pushed Lise away as she tried to get near her husband.  Defs.' Facts ¶ 95; *see also* Ex. F to Cowan Decl.  Others, including defendant Officer Keller and defendant Officer Nappo, gathered around Michael, who was still lying mostly motionless on the ground.  *Id*. ¶ 99.  Plaintiffs contend the police officers and security personnel blocked Lise's view of Michael and pushed Lise, Sabria, and Jalia back away from Michael's position on the ground.  Pls.' Response ¶ 100.  The security footage mostly confirms that claim.  Ex. F to Cowan Decl.

Defendants characterize the family's, and in particular Jalia's, behavior during this period as verbally "violent."  Defs.' Facts ¶¶ 101-03.  But plaintiffs assert that Officer Mauser never described any particular *physical* threat that Jalia, a sixteen-year-old girl, might have posed under the circumstances.  Pls.' Response ¶ 104.  Defendants also assert that defendant Officer Jorgensen and defendant Officer Nappo told Lise, Sabria, and Jalia to leave the hospital "several times" and warned them they would be arrested if they did not.  Defs.' Facts ¶¶ 105, 107.  Lise testified that at some point she did hear defendant Officer Nappo tell her that.  Lise Dep. at 88.  However, Jalia testified that none of the officers told her she would be arrested if she did not leave.  Jalia Dep. at 64.  And Sabria testified that although the officers told her to leave, she was never told she would be arrested if she did not.  Ex. R to Cowan Decl. ("Sabria Dep."), Dkt. No. 72-19 at 62.

In any event, the three refused to leave Michael, who was still lying motionless on the floor.  Defs.' Facts ¶ 111.  The surveillance footage shows Lise, Sabria, and Jalia repeatedly trying to get close to check on Michael.  Ex. F to Cowan Decl.  The video also shows Lise

work her way around the officers and bend down to check on Michael.  *Id*.  From the video, it appears that Lise refused to leave Michael's side and, after repeated attempts to push her back or away failed to get her clear of the area, defendant Officer Nappo decided it would be a good idea to arrest Lise.  *Id*. ¶¶ 118-120.

As their stepmother was being handcuffed, Sabria and Jalia redoubled their efforts to get close to their father and check on his well-being, since after all he was still lying on the floor in front of the elevators.  Defs.' Facts ¶¶ 126-28; *see also* Ex. F to Cowan Decl.  The footage shows defendant Officer Keller arrive late to the scene from down a nearby hallway, immediately walk up to Jalia from behind, grab her wrist, and throw or push her down on the floor of the lobby.  Ex. F to Cowan Decl.  Other officers, including defendant Officer Jorgensen, immediately grab Sabria to prevent her from helping her sister.  *Id*.  Defs.' Facts ¶ 135.  Defendant Officer Jorgensen then throws or pushes Sabria down on the ground, too.  Ex. F to Cowan Decl.

Both girls are arrested, though the parties dispute the lawfulness of the arrests and the parties' conduct during the encounter.  *See, e.g.*, Pls.' Response ¶¶ 130-42.  Michael, forgotten during all of this, can be seen rolling over onto his stomach and making an attempt to crawl along the floor toward his children.  Ex. F to Cowan Decl.  Eventually, one of the officers appears to realize they should also be focused on getting some help for Michael—the "high-risk" patient they've all worked so hard to keep from leaving the hospital—rather than just arresting all of his family members.  *Id*.  This officer points at Michael and appears to direct a nearby staff member to get some assistance.  *Id*.  It takes about several more minutes, but hospital staff eventually get around to transporting Michael back to a hospital bed.  *Id*.

Lise, Sabria, and Jalia were charged with trespassing.  Defs.' Facts ¶¶ 160-62.  Lise and Jalia were also charged with resisting arrest.  *Id*. ¶¶ 160, 162.  They were booked and released the next morning.  *Id*. ¶ 163.  And although it took another psychiatric consult, Michael was released from the hospital the next day, too.  Defs.' Response, Dkt. No. 82-3 ¶ 251.  The charges against all three women were eventually dismissed in the interest of justice.  Defs.' Facts ¶ 165; Defs.' Response ¶ 255.  This suit followed.

## III.  **LEGAL STANDARD**

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment is a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)).  A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a "genuine" dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.

"When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party."  *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted).  Accordingly, summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

## IV.  DISCUSSION

### A.  Threshold Matters

Before getting to the merits of defendants' motion for summary judgment, there are four housekeeping issues to address.

#### 1.  Abandonment & Timeliness

The first is plaintiffs' abandonment of several of their claims for relief.  Plaintiffs' operative pleading is the removed state court complaint, and it does something that seems fairly common for that forum:  rather than set out each individual claim brought by each individual plaintiff in a separately numbered cause of action, the complaint mixes and matches multiple plaintiffs with multiple federal and state law theories of relief.  *See generally* Compl., Dkt. No. 2.

Defendants, for their part, have sought summary judgment on each and every claim they could fairly identify from a careful review of this pleading.  Defs.' Mem., Dkt. No. 72-2 at 12-45.  They moved against plaintiffs' state constitutional claims, *id*. at 12-14, state law negligence claims, *id*. at 14-15, federal excessive force and state law assault and battery claims, *id*. at 15-29, federal and state law false arrest claims, *id*. at 29-37, federal and state law malicious prosecution claims, *id*. at 37-42, federal due process claims, *id*. at 42-43, and any claims brought by Michael in his capacity as plaintiff, *id*. at 43-45.

Plaintiffs, for their part, have defended only a subset of those claims in their opposition memorandum.  Pls.' Opp'n, Dkt. No. 78-2 at 13-29.  In particular, plaintiffs opposed the dismissal of the false arrest claims brought by Lise, Sabria, and Jalia, *id*. at 13-22, the excessive force claims brought by Lise, Sabria, and Jalia, *id*. at 23-25, and the malicious

prosecution claims brought by Lise, Sabria, and Jalia, *id.* at 25-29.

However, as defendants point out in reply, plaintiffs' opposition makes no mention of their state constitutional claims or state law negligence claims, says nothing about any independent due process claim, and omits any discussion of what claims were brought by Michael.  Defs.' Reply, Dkt. No. 82-4 at 5.  Defendants also assert that by focusing on the validity of their § 1983 claims to the exclusion of a separate discussion of the relevant state law distinctions, plaintiffs have abandoned the state law components of their false arrest, excessive force, and malicious prosecution claims.  *Id.*

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."  *Frantti v. New York*, 414 F. Supp. 3d 257, 291 (N.D.N.Y. 2019) (quoting *Taylor v. City of N.Y.*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)).  As the Second Circuit has explained:

> Generally, but perhaps not always, a partial response [to a motion for summary judgment] reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others.  Pleadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them.  Moreover, preparation of a response to a motion for summary judgment is a particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims or defenses.  Indeed, Rule 56 is known as a highly useful method for narrowing the issues for trial.

*Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014).

Upon review, the Court concludes that plaintiffs have abandoned their state law constitutional claims, their state law negligence claims, any due process claims, and any claims brought by Michael as a plaintiff because they have not mounted a defense against

the facially valid arguments for dismissal that were advanced by defendants in their opening brief. *See, e.g.*, *Kovaco v. Rockbestos-Surprenant Cable Co.*, 834 F.3d 128, 143 (2d Cir. 2016) (instructing lower courts to make a specific finding of abandonment where appropriate). Accordingly, plaintiffs' state law constitutional claims, state law negligence claims, any due process claims, and any claims brought by Michael are deemed abandoned and will be dismissed.

However, the Court declines to conclude that Lise, Sabria, and Jalia have abandoned their state law claims for false arrest, assault and battery, or malicious prosecution. Unlike the other claims identified by defendants as undefended and therefore abandoned, these claims are so closely related to their § 1983 analogues that courts and parties typically analyze them together. *See, e.g.*, *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018) ("We have previously stated that claims for malicious prosecution under § 1983 are substantially the same as claims for malicious prosecution under state law." (cleaned up)); *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 494 (N.D.N.Y. 2017) ("Claims for false arrest and false imprisonment are synonymous under New York law, and both are substantially the same as a § 1983 claim for false arrest." (cleaned up)); *Graham v. City of N.Y.*, 928 F. Supp. 2d 610, 624 (E.D.N.Y. 2013) ("Federal excessive force and state law assault and battery claims against police officers are nearly identical."). Accordingly, the state law false arrest, assault and battery, and malicious prosecution claims brought by Lise, Sabria, and Jalia will not be deemed abandoned.

Even so, these state law claims must be dismissed because the applicable statute of limitations ran out before plaintiffs filed suit. Under New York law, a one-year limitations period applies to these common law tort claims. *See* N.Y. C.P.L.R. § 215(3); *see also Allen*

- 14 -

*v. Antal*, 665 F. App'x 9, 13 (2d Cir. 2016) (summary order) (affirming dismissal of state law claims for false arrest, false imprisonment, and assault and battery as barred by one-year limitations period); *TADCO Constr. Corp. v. Dormitory Auth. of State of N.Y.*, 700 F. Supp. 2d 253, 273 (E.D.N.Y. 2010) (finding same as to state law malicious prosecution claims).

Of course, claims for assault and battery accrue when they happen. *See, e.g.*, *Lettis v. U.S. Postal Serv.*, 39 F. Supp. 2d 181, 204 (E.D.N.Y. 1998). But there are two things to keep in mind about when these other torts accrue: *first*, a state law false arrest claim does not accrue until the party has been released from custody or confinement; and *second*, a state law malicious prosecution claim does not accrue until the underlying action is terminated in the plaintiff's favor by dismissal. *See, e.g.*, *TADCO Constr. Corp.*, 700 F. Supp. 2d at 273.

Yet even accounting for these wrinkles in the accrual rules, plaintiffs' state law claims for assault and battery, false arrest, and malicious prosecution are all untimely. The events at issue occurred late in the evening of June 7, 2013. Plaintiffs were released from custody the next morning, on June 8, 2013. And the charges against them were later dismissed in the interest of justice on April 28, 2015. But plaintiffs did not commence this action in state court until May 17, 2016, after the one-year limitations period had already expired. Ex. A to Cowan Decl., Dkt. No. 72-4. Accordingly, plaintiffs' state law claims for assault and battery, false arrest, and malicious prosecution must be dismissed as barred by the statute of limitations.

### 2. **Dr. Lyman's Affidavit**

The second housekeeping matter is the question of whether to consider an affidavit from Michael D. Lyman, Ph.D, an expert retained by plaintiffs for the purpose of this

litigation.  Lyman Aff., Dkt. No. 78-9.  Defendants contend this affidavit must be stricken because it amounts to a supplemental expert report disclosed well after the relevant deadlines in which to do so had passed.  Defs.' Reply at 6-7.  As defendants explain, the parties completed expert disclosures on December 6, 2019 and deposed Dr. Lyman on March 2, 2020, just a few days shy of a March 9, 2020 deadline set by the Court.  *Id*. at 6; *see also* Dkt. No. 61.  However, Dr. Lyman's new affidavit was sworn to on June 11, 2020, well after those discovery deadlines, and was offered by plaintiffs as part of their opposition to defendants' motion for summary judgment.

Upon review, this request is denied.  The purpose of the expert disclosure rule is "to avoid surprise or trial by ambush."  *Am. Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002) (citation omitted).  To that end, the Federal Rules of Civil Procedure provide that a testifying expert's report must include, *inter alia*, a complete statement of all "opinions the witness will express" and the "basis and reasons for them," as well as the "facts or data" the expert considered in forming those opinions.  FED. R. CIV. P. 26(a)(2)(B)(i), (ii).[7]

Trial courts regularly police the boundaries of this disclosure requirement.   For instance, supplemental expert evidence submitted after the close of discovery will be disregarded or stricken when it "expound[s] a wholly new and complex approach designed to fill a significant and logical gap in the first report," since doing so "would eviscerate the purpose of the expert disclosure rules."  *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (quoting *United States v. Vulcan*

---

[7]  The expert also has a duty to supplement the report "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  FED. R. CIV. P. 26(e)(1)(A).

*Soc'y, Inc.*, 637 F. Supp. 2d 77, 107 (E.D.N.Y. 2009)).

In other words, the Rules do not allow a party opposing summary judgment to parse through a opponent's opening brief, find the gaps in their own proof identified by the movant, and then use an affidavit from their expert to fill in those gaps with new theories or approaches designed to defeat the motion and save the claims. *See, e.g.*, *Morritt v. Stryker Corp.*, 2011 WL 3876960, at *6 (E.D.N.Y. Sept. 1, 2011) (sanctioning non-movant plaintiff who brought a design defect claim for using an expert declaration to fill in a gap in the proof identified by the movant with a new analysis).

"However, to the extent that an expert affidavit is within the scope of the initial expert report, it is properly submitted in conjunction with dispositive motions even outside the time frame for expert discovery." *Cedar Petrochemicals, Inc.*, 769 F. Supp. 2d at 279.  Thus, "where an expert's affidavit provides evidentiary details for an opinion expressed in his expert report, those portions of his or her affidavit can be considered." *Id.* (citation omitted).

As defendants tell it, Dr. Lyman's affidavit "seeks to bolster" his previously disclosed expert report and prior deposition testimony.  Defs.' Reply at 6.  But defendants have failed to explain how this new filing "expound[s] a wholly new and complex approach designed to fill a significant and logical gap in the first report." *Cedar Petrochemicals, Inc.*, 769 F. Supp. 2d at 279.  Instead, it appears that Dr. Lyman's affidavit merely "provides evidentiary details" for opinions he has already expressed in his timely filed report.  *Id.*

As Judge D'Agostino explained when faced with a similar dispute, "[w]ithout any analysis regarding how or why defendant is prejudiced by the [ ] affidavit," there is no basis on which to conclude "the affidavit should be stricken from the record on this motion for summary judgment." *GlobalRock Networks, Inc. v. MCI Commc'ns, Inc.*, 943 F. Supp. 2d

320, 345 (N.D.N.Y. 2013).  After all, the purpose of the expert's report "is not to replicate every word that the expert might say on the stand," but "to convey the substance of the expert's opinion . . . so that the opponent will be ready to rebut, cross-examine, and to offer a competing expert[.]"  *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009).  Accordingly, defendants' request to strike Dr. Lyman's affidavit will be denied.

### 3.  Mental Hygiene Law

The third housekeeping matter involves the parties' dispute over the relevance of New York Mental Hygiene Law.  As the factual recitation set forth *supra* makes clear, plaintiffs contend they were told by Dr. Warikoo that Michael was free to leave the hospital.  *See, e.g.*, Lise Dep. at 37-38.  Defendants, of course, assert that Michael was under a Suicide Precaution and therefore could not leave, either before or after the family met with Dr. Warikoo.  *See, e.g.*, Defs'. Facts ¶¶ 23, 61-63.  In response, plaintiffs claim that Michael was *never* under a valid psychiatric hold.  In plaintiffs' telling, Dr. Ramamurthy lacked the initial authority to order[8] him confined, Pls.' Response ¶¶ 186-87, and Dr. Warikoo later told the family that medical staff could not stop Michael if he wanted to leave, ¶¶ 209-210.

In support of this assertion, plaintiffs contend the hospital's medical staff did not follow the requirements of Section 9.27 of New York Mental Hygiene Law.  Pls.' Response ¶ 189.  Among other things, the Mental Hygiene Law ("MHL") provides for the involuntary admission of a patient "alleged to be mentally ill and in need of involuntary care and treatment."  N.Y. MENTAL HYG. LAW § 9.27(a).  This provision of the MHL requires the director of the hospital to receive a sworn application explaining why the patient needs mental health treatment.  *Id*.  It

---

[8]  Dr. Ramamurthy's note indicated that Michael "does not have the capacity, at least now, to make a decision about going home."

also requires a certification from two examining physicians.  *Id*.  And after the patient arrives at the hospital, a member of the hospital's psychiatric staff must also examine the patient and confirm that involuntary admission is appropriate.  § 9.27(e).[9]

Upon review, this provision of the MHL seems like a poor fit for the circumstances in which Michael and the rest of the family found themselves.  In fact, an examination of MHL § 9.27 leaves one with the distinct impression that it is a highly formalized process that a family member (or perhaps agents of the State, like law enforcement) can use to have someone brought into a hospital for psychiatric treatment against their will.  *See, e.g.*, *Balkum v. Sawyer*, 2010 WL 3927817, at *1 (N.D.N.Y. Oct. 4, 2010) (McCurn, J.) (assessing plaintiff's due process claim that he was transferred from a New York State correctional facility to a New York State psychiatric facility and involuntarily confined pursuant to MHL § 9.27).

Michael was not brought into the hospital for a mental health reason; he was brought in because he had been rendered unconscious by the head injury he received during the car accidents.  The concern about his mental status developed later.  And when you think about it in those terms, other provisions of New York law seem like they might be a better fit under the circumstances.

For instance, MHL § 9.39 provides for a more limited kind of forty-eight hour psychiatric hold that can be extended to fifteen days.  N.Y. MENTAL HYG. LAW § 9.39(a)(2).  But even this section of the MHL seems to presuppose that the patient is being brought in from elsewhere primarily or exclusively for a mental health purpose.  § 9.39(a).  Again, the

---

[9]  Other provisions of the MHL provide for notice to family members, § 9.29(b), and mechanisms for challenging the propriety of the involuntary hospitalization, §§ 9.31(a), 9.33(a).

apparent concern about Michael's mental health status came later.

So on what basis did the psychiatric hold get issued?  The SUNY Upstate physicians deposed by plaintiffs all seemed pretty sure that *some* aspect of hospital policy, or perhaps some provision of state law, permitted them to hold a patient like Michael who wanted to leave against medical advice, even if they couldn't quite put their finger on what it was.  *See, e.g.*, Ex. 3 to Kraus Decl., Dkt. No. 78-5 at 27-30 (deposition of Thomas Schwartz, M.D.); Ex. X to Cowan Decl., Dkt. No. 72-25 at 21-23 (deposition of Lori Peppers, M.D.).

In short, defendants' position seems to be that Michael was not competent to make medical decisions for himself at that time.  And it turns out that New York law *does* have a provision of law for that kind of medical question.  Under New York Department of Health ("DOH") regulations, a hospital physician may temporarily detain a mentally disturbed patient for his own protection or for the protection of others.  *See* 10 N.Y.C.R.R. § 405.9(b)(13).

At least one trial court has characterized this provision of state law as authorizing a medical professional to place an unwilling patient under "a kind of "lawful temporary detention."  *Pastorello v. City of N.Y.*, 2004 WL 235255, at *4 (S.D.N.Y. Feb. 6, 2004) (analyzing § 405.9(b)(13) where physician determined patient "was not competent to leave the hospital against medical advice" and recommended a psychiatric evaluation).

This DOH regulation seems like a more likely candidate than MHL § 9.27 to explain the disconnect between the family's belief they were free to leave and the hospital staff's belief that they had the right to continue to hold Michael against his will.  To be clear, though, neither party has raised § 405.9(b)(13), so maybe it is not the source of hospital policy on this issue after all.

In any event, there is no need to reach any firm conclusions on this particularly thorny

issue because this is not a case about whether the hospital acted appropriately.  Plaintiffs have already dismissed their claims against registered nurse Julie Sunser, the only medical staff member initially named as a defendant, and Michael has abandoned any federal or state law claims based on an alleged violation of the MHL.

Of course, plaintiffs remain free to testify to what they believed about Michael's status, and to what Dr. Warikoo or anyone else at the hospital told them when they expressed a desire to leave.  And defendants—who are law enforcement officers, not medical staff members—remain free to testify about what they were told about Michael's status by hospital employees or by SUNY Upstate police dispatch, and to how that knowledge may have informed their decision-making during the situation that unfolded outside the second-floor elevators.

### 4. The Surveillance Video

The fourth and final housekeeping matter involves the impact of the elevator surveillance video at this stage of the proceedings.  Defendants seem to suggest that this footage conclusively establishes certain facts that are helpful to them in defeating plaintiffs' remaining claims on summary judgment.  *See, e.g.*, Defs.' Facts ¶¶ 124-25.

As the Supreme Court has made clear, video evidence must be considered in determining whether any material facts genuinely need to be tried.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the [video] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  However, "the mere existence of a videotape in the record depicting some or all of the events in dispute will not *always* be dispositive at the summary judgment

stage." *Hulett*, 253 F. Supp. 3d at 482; *see also id.* at 481 (cautioning that a reviewing court should not just "uncritically assume that video evidence possesses a unique kind of reliable factual conclusiveness" (citation omitted)).

Upon review, the video does not conclusively establish much.  There is no accompanying audio and the footage is of relatively low quality.  Importantly, the parties' disputes center around whether and when certain defendants uttered certain commands to leave the hospital, and on whether and when those commands were received by certain plaintiffs.  Accordingly, "the appropriate course of action is still to permit the jury an opportunity to resolve the competing versions of events, *in conjunction with the video*, through the ordinary fact-finding processes in which juries engage:  evaluating credibility, drawing inferences from everything they ha[ve] seen and heard, and deciding what all the evidence means and what it reveals about what happened."  *Hulett*, 253 F. Supp. 3d at 482 (cleaned up).

**B.  The Merits**

With these housekeeping matters out of the way, what remains to be addressed are the merits of defendants' motion for summary judgment on the § 1983 claims for false arrest, excessive force, and malicious prosecution brought by Lise, Sabria, and Jalia.

**1.  False Arrest**

"A § 1983 claim for false arrest sounding in the Fourth Amendment is 'substantially the same' as a claim for false arrest under New York law."  *Jackson v. City of N.Y.*, 939 F. Supp. 2d 235, 248 (E.D.N.Y. 2013) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003)).  "To establish a claim under § 1983 for false arrest a plaintiff must show that:  (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement;

(3) the plaintiff did not consent to the confinement; and (4) the confinement was not

otherwise privileged."  *Id*. (citation omitted); *see also Ackerson v. City of White Plains*, 702

F.3d 15, 19 (2d Cir. 2012).

"To avoid liability for a claim of false arrest, an arresting officer may demonstrate that

either (1) he had probable cause for the arrest, or (2) he is protected from liability because he

has qualified immunity."  *Hulett*, 253 F. Supp. 3d at 494 (quoting *Simpson v. City of N.Y.*, 793

F.3d 259, 265 (2d Cir. 2015)).  "A police officer has probable cause to arrest when he has

knowledge of reasonably trustworthy information of facts and circumstances that are

sufficient to warrant a person of reasonable caution in the belief that the person to be

arrested has committed or is committing a crime."  *Id*. (cleaned up).  "The test for probable

cause is an objective one and 'depends upon the reasonable conclusion to be drawn from

the facts known to the arresting officer at the time of the arrest.'"  *Id*. (quoting *Yorzinski v. City

of N.Y.*, 175 F. Supp. 3d 69, 75 (S.D.N.Y. 2016)).

Defendants argue that probable cause existed to arrest Lise, Sabria, and Jalia for

simple trespass.  Defs.' Mem. at 32.  Defendants contend "it is undisputed that [Officer]

Jorgensen communicated to Plaintiffs Mrs. Moore, Sabria, and Jalia that they must leave the

building, otherwise they would be arrested."  *Id*. at 33.  According to defendants, all three

plaintiffs were warned "several times" that they would be arrested if they did not leave.  *Id*.

Plaintiffs respond that defendants have not established that a "lawful" order was

given.  Pls.' Opp'n at 15.  Plaintiffs assert that defendants failed to establish, as a matter of

law, that defendants were authorized to direct plaintiffs to leave.  *Id*. at 16.  Plaintiffs also

assert that, whether or not they possessed this authorization, defendants have not

established a "legitimate" basis for the order to leave, since no medical staff members ever

asked to have them removed.  *Id*.  In plaintiffs' telling, defendants just decided to try to force them to leave rather than allow them to check on Michael's well-being.  *Id*. at 16.

Under New York law, "[a] person is guilty of trespass when he knowingly enters or remains unlawfully in or upon premises."  N.Y. PENAL LAW § 140.05.   A person "enters or remains unlawfully" only "when he is not licensed or privileged to do so."  § 140.00(5).  As relevant here, "[a] person who, regardless of his intent, enters or remains in or upon premises which are at the time open to the public does so with license and privilege unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or other authorized person."  *Id*.

"Where, as here, the alleged trespass occurred on premises generally open to the public, the State has the burden of proving three elements to support a prima facie case of criminal trespass:  (1) that a lawful order excluding the defendant from the premises was issued, (2) that the order was communicated to the defendant by a person with authority to make the order, and (3) that the defendant defied that order."  *Carpenter v. City of N.Y.*, 984 F. Supp. 2d 255, 265 (S.D.N.Y. 2013) (citing *People v. Munroe*, 853 N.Y.S.2d 457, 458 (N.Y. Sup. Ct. App. Term 2007)).[10]

Upon review, defendants' motion for summary judgment on these claims must be denied.  After reviewing the elevator surveillance footage in conjunction with the parties' testimony and briefing as to the timing of events, it simply cannot be said, as a matter of law, that no reasonable factfinder could draw the set of conclusions necessary to find in favor of Lise, Sabria, and/or Jalia on a § 1983 false arrest claim.

---

[10]  Defendants rely on *Carpenter*, which involves a discussion of both § 140.05 (criminal trespass) *and* § 140.10(a) (third-degree criminal trespass).

If anything, defendants' motion for summary judgment raises more questions than it manages to answer.  First, defendants argue that, by the time the elevator lobby incident occurred, plaintiffs were already on notice that they could be lawfully ejected from the hospital.  According to defendants, the family had already been told "they could be asked to leave" earlier that same day, when security was called to the sixth floor of the hospital the first time Michael attempted to leave.  Defs.' Facts ¶ 54.

Plaintiffs dispute whether any of the officers spoke to any of them at that earlier time.  Pls.' Opp'n at 17.  But even on defendants' own version of these facts, this was some kind of conditional warning about some future penalty that might occur if "everyone did not calm down."  Defs.' Facts ¶ 54.  Viewing the disputed facts in plaintiffs' favor, everyone *did* calm down—the family agreed to wait and speak to Dr. Warikoo.  No trespass order was given at that time, by defendants or anyone else.  *See* Pls.' Opp'n at 17 ("No actual order or notice to leave was given at that time.").  Indeed, defendants themselves have stated that they considered the issue on the sixth floor "resolved."  *Id.* ¶ 59.

Second, plaintiffs contend defendants "never established that they were authorized to tell Plaintiffs to leave the premises or that any order to do so had a legitimate basis."  Pls.' Opp'n at 16.  According to plaintiffs, an order to leave the hospital should have come through someone on the hospital's medical staff.  *See id.*  In their reply papers, defendants attempt to rebut this claim by offering (1) the Seventh Edition of the SUNY Police Manual, which gives State police officers the authority to enforce state law and campus rules and regulations, Ex. A to Cowan Reply Decl., Dkt. No. 82-1, and (2) an excerpt from the SUNY Upstate policy manual, which establishes a procedure for handling "disruptive behavior" by visitors and non-patients, Ex. B to Cowan Reply Decl., Dkt. No. 82-2.

As relevant here, the SUNY Upstate policy indicates that "University Police, working with the Nursing Supervisor and the unit managers, may restrict visitation for patients and/or visitors and non-patients that disturb medical care and/or the normal operations of the institution." *Id*. at 2.  Defendants also cite to Officer Jorgensen's deposition, where he testified that he had authority to command plaintiffs to leave the hospital.  Ex. U to Cowan Decl., Dkt. No. 72-22 at 67.  Defendants rely on these citations to argue that plaintiffs were "undoubtedly, from the medical staffs' [*sic*] point of view, interfering with [Michael's] medical care and disturbing the normal operations of the hospital."  Defs.' Reply at 8.

But that argument does not answer the question of whether or not SUNY police were required to rely on hospital staff to make that kind of determination in the first instance.  On one hand, the policy cited by defendants indicates that the University police have been "designated by the President to issue Warnings and Notices in appropriate circumstances."  On the other, the policy's language appears to indicate that the "Nursing Supervisor" and/or "unit managers" have some form of decision-making responsibility for "restrict[ing] visitation" for "visitors and non-patients."

If you track backward to the legal provisions cited in this policy document, you land on a section of New York's law governing public college campuses.  This law prohibits any person from, *inter alia*, "refus[ing] to leave any building or facility after being required to do so by an authorized administrative officer."  8 N.Y.C.R.R. § 535.3(g).  And another provision of this law gives the "chief administrative officer or his designee" authority to revoke a visitor's license to be on the premises.  § 535.6(b).  It also specifically indicates that "[n]othing in this [section] shall be construed to . . . affect [a visitor's] liability to prosecution for trespass or loitering as prescribed in the Penal Law."  *Id*.

None of these regulations explicitly allocate to SUNY police officers the individual responsibility or unilateral authority for revoking a visitor's license to be in a public space like the second-floor lobby of the hospital, though it seems likely that some combination of these legal provisions mean that SUNY police have been designated to perform that function (possibly even in the absence of a hospital staff member's involvement). Because plaintiffs raised the issue and trespass requires the order to be lawful, it would have been better if defendants had thoroughly spelled out the precise source of this authority.

Third, defendants rely heavily on what they believe is "clearly corroborated" or made "abundantly clear" by the video footage of the elevator lobby, Defs.' Mem. at 33-34, but the question of what each defendant told each plaintiff (and when and how) remains in dispute. "The issue of precisely when an arrest takes place is a question of fact." *Jackson*, 939 F. Supp. 2d at 249. Defendants contend they repeatedly ordered Lise, Sabria, and Jalia to leave, and repeatedly warned them they would be arrested if they failed to comply with this order. *See, e.g.*, Defs. Facts ¶¶ 105, 107.

Notably, though, there is no audio to accompany the video. And as plaintiffs note, defendants have not argued that plaintiffs "were in the hospital after visiting hours or were otherwise in an area of the hospital that visitors were not permitted." Pls.' Opp'n at 16. Thus, because they were in a public area of SUNY Upstate, plaintiffs enjoyed a "license and privilege" to be there unless and until they defied "a lawful order not to enter or remain, personally communicated to [them] by the owner of such premises or other authorized person." N.Y. PENAL LAW § 140.00(5).

Under these circumstances, neither defendants' own favorable interpretation of what the footage shows, nor defendants' own assertions about when and how they told plaintiffs to

leave the area, entitle them to judgment as a matter of law.  Jalia testified that none of the officers told her she would be arrested if she did not leave.  Jalia Dep. at 64.  And Sabria testified along similar lines.  Sabria Dep. at 62.  Defendants correctly note that Lise testified that, at some point, she heard one of the defendants tell her she would be arrested if she did not leave.  Lise Dep. at 88.  But in her deposition that information seemed to come almost contemporaneously with being handcuffed.  *Id*.  In short, these factual questions about the timing of events need to be resolved by a finder of fact.

Fourth, simple trespass is a "violation."  N.Y. Penal Law § 140.05.  The surveillance video shows defendant Officer Keller, who arrived late to the scene from a nearby hallway, immediately walk up to Jalia from behind, grab her wrist, and throw or push her down on the ground.  "An officer may make an arrest for a violation, defined by New York law as a 'petty offense,' if he reasonably believes it was committed in his presence."  *Walston v. City of N.Y.*, 289 F. Supp. 3d 398, 412 (E.D.N.Y. 2018) (cleaned up); N.Y. CRIM. PROC. L. §§ 1.20(39), 140.10(1)(a)(2).

The upshot of this observation about trespass being a violation serves to emphasize that what defendant Officer Keller knew, and when he learned of it, is also in dispute.[11]  Defendant officer Keller likely knew from SUNY dispatch that Michael was not authorized to leave and that Michael's family was with him in the second-floor elevator lobby area.  But viewed in the light most favorable to the non-movants, it is far from clear right now that defendant Officer Keller knew that one or more plaintiffs had already refused to comply

---

[11]  Under the doctrine of collective or imputed knowledge, an arresting officer can rely on information known by other officers.  *See, e.g.*, *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007).  However, the doctrine only applies if there has been some actual communication between the officers involved.  *See, e.g.*, *Celestin v. City of N.Y.*, 581 F. Supp. 2d 420, 430 n.6 (E.D.N.Y. 2008).

with a lawful order to leave.

Fifth, defendants also identify New York's resisting arrest statute as a basis for establishing probable cause.  Defs.' Mem. at 34.  A person is guilty of resisting arrest "when he intentionally prevents or attempts to prevent a police officer . . . from effecting an authorized arrest of himself or another person."  N.Y. PENAL LAW § 205.30 (emphasis added).  But because there is a genuine dispute regarding whether the arrests were authorized at their inception (and at what point an arrest occurred as to each plaintiff), it cannot be said as a matter of law that the arrests were *authorized* as a matter if law at the time plaintiffs allegedly resisted them.  *Hulett*, 253 F. Supp. 3d at 496.

In sum, these factual uncertainties preclude summary judgment.  They also preclude the grant of qualified immunity at this juncture.  *Hulett*, 253 F. Supp 3d at 495-96 (finding same where surveillance video failed to establish objective reasonableness of the arrest).  Accordingly, Lise, Sabria, and Jalia's § 1983 false arrest claims remain for trial.

### 2. <u>Excessive Force</u>

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest."  *Hulett*, 253 F. Supp. 3d at 491 (quoting *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010)).  To succeed on a § 1983 excessive force claim, a plaintiff must show that the defendant's use of force was "objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Hulett*, 253 F. Supp. 3d at 491 (cleaned up).  "If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe."  *Id*.

This "objective reasonableness" inquiry is "necessarily case and fact specific and

requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Hulett*, 253 F. Supp. 3d at 491 (quoting *Tracy*, 623 F.3d at 96).  Thus, review is "guided by consideration of at least three factors:  (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy*, 623 F.3d at 96 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

"Importantly, a court must evaluate the record from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hulett*, 253 F. Supp. 3d at 491 (cleaned up).  "In so doing, it is important to make allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*.  "Accordingly, police receive a fairly wide zone of protection in close cases involving potential danger, emergency conditions, and other exigent circumstances." *Id*.

Defendants contend that the excessive force claims must be dismissed because none of the plaintiffs can show anything more than *de minimis* injuries.  Defs.' Mem. at 18-26.  As for Lise, defendants contend she has not claimed any physical injury as a result of her arrest, and has not sought any psychological therapy or counseling.  *Id*. at 20.  As for Jalia and Sabria, defendants contend "the evidence shows that no rational jury could find that the force used on [them] was so excessive that no reasonable officer would have made the same choice." *Id*. at 23.

Plaintiffs respond by emphasizing the exceedingly minor nature of the alleged trespass offense and point out that the video does not show any obvious physical threat to

any of the officers or security guards that would warrant the defendants' conduct in this case.  Pls.' Opp'n at 23.  According to plaintiffs, "[t]he medical staff never asked for the three women to be removed, and never claimed that they were a physical threat to anyone."  *Id*. at 24.

Upon review, defendants' arguments will be rejected.  "It is well established that the right to make an arrest accompanies with it the right to use some degree of physical coercion."  *Abdul-Rahman v. City of N.Y.*, 2012 WL 1077762, at \*7 (E.D.N.Y. Mar. 30, 2012).  But defendants are begging the question by relying heavily on certain events that they claim happened before the use of force occurred; *i.e.*, defendants claim that their verbal warnings, and plaintiffs' continued refusal to comply with them, justify the subsequent decision to forcibly arrest the family members.  However, as just discussed *supra*, those facts are genuinely in dispute right now—plaintiffs contest whether defendants were authorized to make any arrests at all under the circumstances of this case.  Accordingly, this argument does not provide a basis for summary judgment.

Alternatively, defendants insist that the force used was not actionable as a constitutional violation.  According to defendants, "it is well established that where there is no injury and no medical treatment sought, an excessive force claim cannot stand as a matter of law."  Defs.' Mem. at 18.  This argument will also be rejected.  As an initial matter, "this case law focuses on whether the force used was *de minimis*, rather than whether the alleged injury was *de minimis*."  *Sharnick v. D'Archangelo*, 935 F. Supp. 2d 436, 448 (D. Conn. 2013) (suggesting nominal damages might be available even though evidence of the plaintiff's injuries was "weak").

More importantly, it turns out that this is actually something of an open question in the

Second Circuit. *Rizk v. City of N.Y.*, –F. Supp. 3d–, 2020 WL 2734361, at *12 (E.D.N.Y. May 22, 2020). In *Rizk*, the trial court explained that this "more than de minimis injury" requirement is typically imposed on prisoners who have asserted excessive force claims under the Eighth Amendment, where the standard of proof is higher. *Id*. And although this requirement is also sometimes applied by trial courts to claims brought by free-world litigants, *Rizk* emphasized that "[m]any circuit courts have expressly rejected" this approach to Fourth Amendment excessive force claims. *Id*. Accordingly, *Rizk* held that "excessive force claims cannot be dismissed solely for failure to establish more than de minimis injury." *Id*.

Upon review, the Court agrees with the analysis in *Rizk*. Evidence of lasting or serious injury might have helped burnish the excessive force claims. *Cf. Hodge v. Vill. of Southhampton*, 838 F. Supp. 2d 67, 75 (E.D.N.Y. 2012) (observing that jury is free to consider that fact among others in assessing defendant's conduct). But the relevant legal analysis depends not on a particular quantum of injury but on a showing of the objective reasonableness of the conduct. *Brown v. City of N.Y.*, 798 f.3d 94, 103 (2d Cir. 2015) ("A court's role in considering excessive force claims is to determine whether a jury, instructed as to the relevant factors, could reasonably find that the force used was excessive.").

Because there are related disputes of fact over the timing and validity of the arrests and of the accompanying use of force to effect those arrests, summary judgment must be denied. *Hulett*, 253 F. Supp. 3d at 491 ("[G]ranting summary judgment against a plaintiff on an excessive force claims is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable."). These disputes over the fact pattern also preclude defendants' arguments about qualified immunity. *Id*. at 493 (denying qualified immunity based on dispute over material historical facts leading to the use of

force).  Accordingly, Lise, Sabria, and Jalia's § 1983 excessive force claims remain for trial.

### 3. **Malicious Prosecution**

 "The elements of a § 1983 malicious prosecution claim require that the plaintiff prove that (1) the defendant initiated a prosecution against the plaintiff, (2) the defendant lacked probable cause to believe the proceeding could succeed, (3) the defendant acted with malice, (4) the prosecution was terminated in plaintiff's favor, and (5) there was a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Bernshtein v. City of N.Y.*, 496 F. App'x 140, 142 (2d Cir. 2012) (citation omitted).

The criminal charges against plaintiffs were dismissed under § 170.40 of the New York Criminal Procedure Law, which provides for dismissal "in the interest of justice."  Defs.' Facts ¶ 165; Defs.' Response ¶ 255.  On April 20, 2015, after plaintiffs' counsel made § 170.40 motions for dismissal, Onondaga County Assistant District Attorney ("ADA") Maureen H. Barry sent a letter to Syracuse City Court Judge Theodore H. Limpert. Ex. 10 to Kraus Decl., Dkt. No. 78-12.  As ADA Barry's letter explained, the State "plan[ned] to concede to defendants' motions but ask that these matters be scheduled so that the People can place [their] exact position on the record." *Id*.  Thereafter, during an April 28, 2015 conference before Judge Limpert, ADA Barry explained to the court that the State conceded because no one was injured, the harm was minimal, and plaintiffs had been cooperative throughout the proceedings.  Ex. 11 to Kraus Decl. (traditionally filed with Clerk's Office).

As a general matter, "claims for malicious prosecution under § 1983 are substantially the same as claims for malicious prosecution under state law." *Lanning*, 908 F.3d at 25 (cleaned up).  However, the Second Circuit has recently rejected the "the more permissive standard of proof" available under New York law on the so-called "favorable termination"

element of a malicious prosecution claim.  *Thompson v. Clark*, 794 F. App'x 140, 141 (2d Cir. 2020) (summary order).

This distinction between state and federal law is a problem for plaintiffs.  Unlike its state law analogue, the "favorable termination" element on a § 1983 claim for malicious prosecution cannot be satisfied absent some "affirmative indications of innocence."  *Lanning*, 908 F.3d at 25.  As the Second Circuit explained in *Lanning*, "where a dismissal in the interest of justice 'leaves the question of guilt or innocence unanswered[,] . . . it cannot provide the favorable termination required as the basis for [that] claim."  908 F.3d at 28-29 (quoting *Hygh v. Jacobs*, 961 F.2d 359, 367-38 (2d Cir. 1992)).  Accordingly, an "interest of justice" dismissal under § 170.40 "is by itself insufficient to satisfy the favorable termination requirement as a matter of law."  *Thompson*, 794 F. App'x at 141

Upon review, plaintiffs cannot satisfy the more demanding "favorable termination" requirement set out by the Second Circuit in *Lanning*.[12]  The record evidence supplied by plaintiffs does not affirmatively indicate that the § 170.40 dismissal was granted because plaintiffs were innocent.[13]  *See, e.g.*, *Antic v. City of N.Y.*, 273 F. Supp. 3d 445, 457 (S.D.N.Y. 2017) (opining that evidence of innocence proffered in support of a § 170.40 dismissal would support "favorable termination").

Instead, the record suggests the dismissal was joined by ADA Berry and granted by

---

[12]  In general, the question of whether a termination was favorable to the accused is a matter of law for the court, but where questions remain as to the reason for the termination, this becomes an issue of fact for the jury."  *Thompson v. Clark*, 364 F. Supp. 3d 178, 195 (E.D.N.Y. 2019).

[13]  In *Myers v. Moore*, 326 F.R.D. 50 (S.D.N.Y. 2018), a pre-*Lanning* case, the trial court offered several reasons why the § 170.40 dismissal in that particular case satisfied the "favorable termination" requirement.  *Id*. at 65 n.9.  The reader should note, though, that the *Myers* Court relied in part on *Cantalino v. Danner*, 96 N.Y.2d 391 (N.Y. 2001), a New York Court of Appeals decision that rejected the idea that a § 170.40 dismissal could never constitute a favorable termination.  In *Lanning*, the Second Circuit held that developments in New York law (*e.g.*, *Cantalino*) did not control the § 1983 analysis.  908 F.3d at 27.

Judge Limpert out of mercy or leniency in light of the minimal harm at issue and plaintiffs' cooperation with the prosecution.  But that reasoning is not enough to satisfy the favorable termination element under federal law.  *See, e.g.*, *Arum v. Miller*, 273 F. Supp. 2d 229, 234-35 (E.D.N.Y. 2003) ("A dismissal out of mercy is not a favorable termination because mercy presupposes the guilt of the accused.").  As courts have repeatedly held since *Lanning*, a dismissal under these circumstances does not "affirmatively indicate" innocence.  *See, e.g.*, *Simon v. City of N.Y.*, 2020 WL 1323114, at *3 (E.D.N.Y. Mar. 19, 2020) (relying on *Lanning* to dismiss plaintiff's § 1983 malicious prosecution claim where underlying charges were dismissed "in the interest of justice"); *Burdick v. Swarts*, 2019 WL 1409938, at *6 (N.D.N.Y. Mar. 28, 2019) (Mordue, J.) ("[A] dismissal pursuant to Section 170.40 is not an acquittal and typically does not support a malicious prosecution claim.").  Accordingly, Lise, Sabria, and Jalia's § 1983 malicious prosecution claims must be dismissed.

## V.  <u>CONCLUSION</u>

Defendants are free to characterize the family's behavior as "disruptive" or "uncooperative" or something else, but forcibly arresting the wife and children of a man lying motionless on the floor of a hospital lobby seems like a particularly thoughtless way to get a handle on a difficult situation.  Whether or not defendants' approach violated anyone's civil rights is a matter for a jury.

Therefore, it is

ORDERED that

1.  Defendants' motion for summary judgment is GRANTED in part and DENIED in part;

2.  Plaintiffs' state law constitutional claims, state law negligence claims, due process claims, and any claims brought by Michael Moore have been abandoned and are DISMISSED;

3.  Michael Moore is DISMISSED as a named plaintiff;

4.  Plaintiffs' state law assault and battery claims, state law false arrest claims, and state law malicious prosecution claims are barred by the applicable statute of limitations and are DISMISSED;

5.  Plaintiffs' § 1983 malicious prosecution claims are DISMISSED; and

6.  A jury trial on plaintiffs Lise Moore, Sabria Moore, and Jalia Graham's § 1983 claims for false arrest and excessive force is scheduled for December 14, 2020 in Utica, New York.

IT IS SO ORDERED.


Dated:  October 28, 2020
        Utica, New York.

_____
United States District Judge