UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LISE Y. MOORE, SABRIA
MOORE, and JALIA GRAHAM,

                    Plaintiffs,

          -v-                              5:16-CV-1230

MICHAEL KELLER, MICHAEL
JORGENSEN, and JOSEPH NAPPO,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                       OF COUNSEL:

SIDNEY P. COMINSKY, LLC            SIDNEY P. COMINSKY, ESQ.
Attorneys for Plaintiffs           SYLVIA BODE KRAUS, ESQ.
1500 State Tower Building
Syracuse, NY 13202

HON. LETITIA JAMES                 AIMEE COWAN, ESQ.
New York State Attorney General    Ass't Attorney General
Attorneys for Defendants
300 South State Street, Suite 300
Syracuse, NY 13202

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

On September 19, 2016, plaintiffs Michael Moore ("Michael"), Lise Y.

Moore ("Lise"), Sabria Moore ("Sabria"), and Jalia Graham ("Jalia") filed this

action in Supreme Court, Onondaga County, against defendants SUNY

Upstate University ("SUNY Upstate" or the "hospital") police officers Michael

Keller ("Officer Keller"), Paul Daugherty ("Officer Daugherty"), Michael

Jorgensen ("Officer Jorgensen"), Joseph Nappo ("Officer Nappo"), SUNY

Upstate public safety officer Stephen Mauser ("Officer Mauser"), and hospital

registered nurse Julie Sunser ("Nurse Sunser").  Dkt. No. 1.  According to

plaintiffs' ten-count complaint, defendants violated 42 U.S.C. § 1983 and

related state law when they forcibly prevented Michael from leaving the

hospital and then arrested Lise, Sabria, and Jalia.  Dkt. No. 2.

On October 11, 2016, defendants removed the action to federal court and

answered the complaint.[1]  Dkt. Nos. 1, 4.  Shortly thereafter, plaintiffs moved

to remand the case to state court.  Dkt. No. 10.  According to plaintiffs, their

state law claims presented novel and complex questions under the Mental

Hygiene Law.  *Id.*  After oral argument, that request was denied.  *Moore v.

Keller*, 2017 WL 3822053 (N.D.N.Y. Aug. 31, 2017).  The parties completed

discovery and stipulated to the dismissal of the claims against Officer

Daugherty, Officer Mauser, and Nurse Sunser.  Dkt. Nos. 63, 67, 68.

On April 22, 2020, Officer Keller, Officer Jorgensen, and Officer Nappo

(collectively "defendants") moved under Federal Rule of Civil Procedure

---

[1] Officer Mauser answered the complaint at a later time.  Dkt. No. 30.  A suggestion of death
was filed for this defendant on September 16, 2019.  Dkt. No. 55.  The claims against him were later
dismissed by stipulation.  Dkt. Nos. 63–64.

("Rule") 56 for summary judgment on all of plaintiffs' remaining claims.  That

motion was granted in part and denied in part on October 29, 2020.  *Moore v.*

*Keller*, 498 F. Supp. 3d 335 (N.D.N.Y. 2020).  In *Moore*, the Court dismissed

all of Michael's claims and terminated him as a plaintiff.  *Id*. at 347.  *Moore*

also dismissed all of the state law claims on procedural grounds.  *Id*.  And

*Moore* dismissed Lise, Sabria, and Jalia's § 1983 malicious prosecution claims

for failure to create a jury question on the "favorable termination"

element.  *Id*.  However, *Moore* determined that genuine disputes of material

fact necessitated a trial on Lise, Sabria, and Jalia's § 1983 claims for false

arrest and excessive force.  *See id*.

On April 26, 2021, a jury trial began in Utica, New York.  After hearing

three days of evidence and deliberating for most of a fourth, the jury found

that Officer Keller had falsely arrested Jalia and awarded her $30,000 in

actual damages.  Court's Ex. No. 6, Dkt. No. 112 at 13–14.[2]  The jury also

found that Officer Keller had used excessive force against Jalia, but it

concluded that this force was not the proximate cause of any injury she

suffered.  *Id*. at 13.  However, the jury rejected Lise's § 1983 claims against

Officer Nappo.  Court's Ex. No. 4, Dkt. No. 112 at 3.  The jury also rejected

---

[2]  Pagination corresponds to CM/ECF.

Sabria's § 1983 claims against Officer Jorgensen.  Court's Ex. No. 5, Dkt. No. 112 at 8.  Judgments were entered accordingly.  Dkt. Nos. 113, 114.

Both parties are dissatisfied with the verdict.  Plaintiffs, for their part, have moved for a new trial under Rule 59.  Defendants, for their part, have moved for judgment as a matter of law under Rule 50.  The motions have been fully briefed and will be decided on the basis of the submissions without oral argument.

## II.  LEGAL STANDARDS

### A.  Judgment as a Matter of Law

"Federal Rule of Civil Procedure 50 sets forth the procedural requirements for challenging that sufficiency of the evidence in a civil jury trial and establishes two stages for such challenges—prior to submission of the case to the jury, and after the verdict and entry of judgment."  *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 399 (2006).

At the first stage, a movant may seek judgment as a matter of law if, after a party has been fully heard on an issue during trial, "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  FED. R. CIV. P. 50(a).  "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."  FED. R. CIV. P. 50(b).  At this

- 4 -

second stage, "the movant may file a renewed motion for judgment as a matter of law." *Id.*

"To warrant post-verdict judgment as a matter of law, the movant must show that the evidence, when viewed most favorably to the non-movant, was insufficient to permit a reasonable juror to have found in the non-movant's favor." *Conte v. Emmons*, 895 F.3d 168, 171 (2d Cir. 2018). "This is a particularly heavy burden where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Carroll v. Cty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013) (per curiam) (cleaned up).

Under those circumstances, relief "may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against him." *Kinneary v. City of N.Y.*, 601 F.3d 151, 155 (2d Cir. 2010) (cleaned up).

### B.  Motion for a New Trial

Under Rule 59, a court "may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A).  There are four bases on which to award a new trial: "(1) the verdict is against the clear weight of the evidence; (2) the

trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the jury; or (4) damages are excessive." *Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 174 (E.D.N.Y. 2012) (citation omitted).

"Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 14, 134 (2d Cir. 1998). Indeed, "a trial judge is free to weight the evidence himself, and need not view it in the light most favorable to the verdict winner." *Id.* However, "trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) (cleaned up).

## III. <u>DISCUSSION</u>

A full account of the substantive law governing plaintiffs' § 1983 claims can be found in *Moore*, 498 F. Supp. 3d 335, and the competing factual narratives of the events that took place at the hospital can be found in the trial transcript. Dkt. Nos. 126–31, 139. Because the parties are already familiar with this body of material, it will be discussed only to the extent necessary to resolve the pending motions.

## A.  Judgment as a Matter of Law

Officer Keller contends that the Court should direct the entry of judgment as a matter of law in his favor because he is entitled to qualified immunity from Jalia's § 1983 false arrest and excessive force claims.[3]  Defs.' Mem., Dkt. No. 133-5 at 8.  According to defendants, Jalia was given a lawful order to leave the hospital, either because Officer Keller did so himself just before arresting her or because Officer Jorgensen and Officer Nappo told the entire family to leave just before Officer Keller arrived on the scene.  *Id*. at 12–13.

As an initial matter, however, defendants' brief repeatedly laments that the Court did not submit to the jury any special interrogatories about Officer Keller's qualified immunity defense.  *See, e.g.*, Defs.' Mem. at 11.  "Special interrogatories are vehicles to allow the jury to resolve 'key factual disputes' bearing on the legal determination of qualified immunity."  *Alla v. Verkay*, 979 F. Supp. 2d 349, 370 (E.D.N.Y. 2013).

It is true that the Court denied defendants' request to propose special interrogatories to the jury.  Notably, however, although counsel made reference to them at trial, defendants never actually filed a set of proposed

---

[3]  Qualified immunity is an independent determination that must be made by the Court, even after a favorable jury verdict.  *See* Defs.' Mem. at 9–10.  This has been the law of the Circuit for quite some time.  *See, e.g.*, *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) ("[T]he ultimate legal determination of whether qualified immunity attaches to a law enforcement agent's actions is a question of law better left for the court to decide.").

questions on the Court's docket.  An independent search reveals that
defendants e-mailed a document to the Court's ECF mailbox on April 16,
2021.  However, this document was not filed on the docket.  *Cf. Zellner v.
Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) ("To the extent that a particular
finding of fact is essential . . . to qualified immunity, it is the responsibility of
the defendant to request that the jury be asked the pertinent question.").

In any event, defendants' six-page proposal includes twenty-nine binary
questions (a number that does not account for those questions with subparts
for each named defendant).  Of these twenty-nine questions, two are arguably
relevant to the current analysis: question twenty-three proposed to ask the
jury whether Officer Keller "arrived from the cafeteria area and told Jalia
that she had to leave?"  And question twenty-four proposed to ask the jury
whether Jalia responded to Officer Keller "that she was not going to leave?"

These facts were in dispute.  Even so, the Court determined that the use of
special interrogatories were unnecessary on the facts of the case.  *Stephenson*,
332 F.3d at 81 n.19 ("[T]he use of interrogatories is a matter for the judge's
discretion.").  This is because, as discussed *infra*, the "key factual dispute"
presented by Officer Keller's arrival in the lobby area lent itself to a clear
resolution on the basis of the jury's verdict.  Accordingly, posing these
additional questions to the jury would have been redundant.  *Cf. Alla*, 979 F.

Supp. 2d at 370 (finding no duty to present interrogatories that would confuse or mislead the jury).

### 1. **False Arrest**

"To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity." *Moore*, 498 F. Supp. 3d at 352 (cleaned up).

At trial, Officer Keller testified that he possessed probable cause to conduct a warrantless arrest of Jalia for trespassing and resisting arrest.[4]  Dkt. No. 127 at 29:13–14.  "The test for probable cause is an objective one and depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Moore*, 498 F. Supp. 3d at 352 (cleaned up).  "A police officer has probable cause to arrest when he has knowledge of reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* (citation omitted).

---

[4]  Probable cause need not exist for the charge "actually invoked by the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 154 (2004).  Instead, an arrest is privileged "if there was probable cause to arrest . . . for any single offense." *Marcavage v. City of N.Y.*, 689 F.3d 98, 109–10 (2d Cir. 2012).  However, the parties' arguments have always been limited to the two state law offenses for which Jalia was actually arrested and charged.  The Court confines its analysis accordingly.

When questioned about why probable cause existed to arrest Jalia, Officer

Keller explained:

> Q. Why did you charge her with trespass?
>
> A. Because she had been told to leave and she stated
>    that she wasn't going to.
>
> Q. And because she said that she wasn't going to leave,
>    what gave you the right to arrest her for trespass?
>
> A. Reasonable cause to believe that she committed the
>    violation of trespass by entering or remaining
>    unlawfully upon the premises.
>
> Q. And how did she remain unlawfully on the hospital
>    premises?
>
> A. By being told to leave and not leaving and stating
>    that she was not leaving.
>
> Q. With respect to the resisting arrest charge, why did
>    you arrest her for that?
>
> A. Because she resisted the arrest by using physical or
>    mechanical means to enhance her resistance by
>    pulling her arm away.

Dkt. No. 127 at 29:13–30:6.  However, in her own testimony, Jalia repeatedly

denied that Officer Keller instructed or warned her to leave before initiating

his arrest.  *See, e.g.*, Dkt. no. 126 at 4:1, 4:18–21, 5:8–10.

This presented a straightforward credibility dispute for the jury.  As

relevant here, "[a] person who, regardless of his intent, enters or remains in

or upon premises which are at the time open to the public does so with license

and privilege unless he defies a lawful order not to enter or remain, personally communicated to him by the owner of such premises or other authorized person."  N.Y. PENAL LAW § 140.00(5). [5]

After the close of the proof, the jury was instructed on the definition of "probable cause" and cautioned that:

> probable cause does not need to be based on evidence that would be sufficient to support a conviction, or even a showing that the defendant's belief was probably right.  While you have heard evidence that all the charges against the plaintiffs were later dismissed, this does not necessarily mean that the defendant lacked probable cause to arrest.

Court's Ex. No. 3, Dkt. No. 116 at 30.  The jury was also instructed on the elements of trespassing and of resisting arrest, the two state law offenses identified by the parties as relevant to this dispute.  *Id*. at 31–34.  During deliberations, the Court received from the jury a note that inquired:

> 1.  Question:   Does the arresting officer have to give the order, or have knowledge of the order being given before they can make the arrest?
>
> 2.  Question:   Can the order be given after the arrest is made?

Court's Ex. No. 7A, Dkt. No. 115.

---

[5]  A person is guilty of resisting arrest "when he intentionally prevents or attempts to prevent a police officer . . . from effecting an authorized arrest of himself or another person."  N.Y. PENAL LAW § 205.30.  Notably, however, "a person who physically resists an unauthorized arrest is not guilty of 'resisting arrest,' though such person may be guilty of 'assault.'"  William C. Donnino, *Practice Commentary to N.Y. Penal Law § 205.30.*

After consulting with the parties, the Court answered the first question "yes," the second question "no," and further directed the jury to "refer to page 32 of [the] instructions, and in particular elements one through three," which as discussed *supra* set forth the elements of trespass under New York law. Court's Ex. 7A. Shortly thereafter, the jury found in Jalia's favor on her § 1983 false arrest claim against Officer Keller. Court's Ex. 6 at 13. In reaching that conclusion, the jury necessarily rejected Officer Keller's testimony that he instructed or warned Jalia to leave the hospital before initiating the arrest for trespassing.

The remaining question is whether qualified immunity nevertheless defeats Jalia's § 1983 claim. "Qualified immunity protects government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jones*, 963 F.3d at 224 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Under the two-step framework articulated by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), to defeat qualified immunity a plaintiff must show that (1) the official violated a statutory or constitutional right (2) that was "clearly established" at the time of the challenged conduct. *Francis v. Fiacco*, 942 F.3d 126, 139 (2d Cir. 2019).

Notably, however, step two of this straightforward-seeming inquiry has proven challenging in practice. *See, e.g.*, *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019) ("The second question—whether the officer violated clearly established law—is a doozy."). To help clarify the qualified immunity analysis, the Second Circuit has sometimes broken it into three discrete inquiries: (1) whether the plaintiff has established that the defendant violated a constitutional right; (2) if so, whether that right was "clearly established"; and (3) even if that right was "clearly established," whether it was still "objectively reasonable" for the officer to believe his conduct was lawful. *Gonzalez v. Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (citing *Taravalla v. Town of Wolcott*, 599 F.3d 129, 133–34 (2d Cir. 2010)).

The jury answered the first question in this analysis; *i.e.*, whether Officer Keller violated Jalia's constitutional right to be free from an arrest in the absence of probable cause, in the affirmative. And the answer to the second question is also an obvious "yes," since the right to be free from an arrest without probable cause was clearly established in this Circuit well before Jalia's arrest on June 7, 2013. *See, e.g.*, *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("Without a doubt, the right not to be arrested without probable cause is clearly established.").

Thus, Officer Keller's bid for qualified immunity from Jalia's false arrest claim turns on the answer to the third and final question; *i.e.*, whether it was

"objectively reasonable" for Officer Keller to believe his conduct was

lawful. *Gonzalez*, 728 F.3d at 157.  In the false arrest context, "[a]n officer's

determination is objectively reasonable if there was 'arguable' probable cause

at the time of the arrest—that is, if 'officers of reasonable competence could

disagree on whether the probable cause test was met.'"  *Id.* (quoting *Jenkins*

*v. City of N.Y.*, 478 F.3d 76, 86–87 (2d Cir. 2007)).  "Put another way, an

arresting officer will find protection under the defense of qualified immunity

unless 'no reasonably competent officer' could have concluded, based on the

facts known at the time of the arrest, that probable cause existed."  *Figueroa*

*v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016).

Defendants argue that qualified immunity is appropriate on Jalia's false

arrest claim because, "based on consideration of all the evidence available to

[Officer] Keller at the time he arrested Jalia, the Court is not in a position to

conclude that 'no reasonable officer' could have determined that probable

cause existed to arrest her for trespass and/or resisting arrest."  Defs.' Mem.

at 14.

In conducting this analysis, it helps to remember that on a Rule 50(b)

motion, the court must "defer[ ] to the jury's assessment of the evidence and

all reasonable inferences the jurors could draw from that evidence," and "may

not itself weigh the credibility of witnesses or consider the weight of the

evidence." *Toliver v. N.Y. City Dep't of Corr.*, 202 F. Supp. 3d 328, 333

(S.D.N.Y. 2016) (citation omitted).

Defendants' brief in support of qualified immunity focuses on Officer

Keller's own testimony about the incident.  For instance, on direct

examination Officer Keller testified that:

> Q. So just to kind of recap, when you are walking through these doors, what information do you already have about what is unfolding here?
>
> A. That the Moore family had left the sixth floor with a high-risk psych patient and were attempting to remove him from the hospital, they had been stopped.  And that now at least – at the very least, a verbal argument had ensued and in at least one case, somebody has gone hands on.  And I don't know that that meant it was an arrest or whether they were just escorting people.
>
> . . . .
>
> Q. Okay.   Now, when you walk through the doors, what did you see?
>
> A. Again, I saw people running around.  I heard people yelling and screaming.   I believe I saw Michael Moore laying on the ground.  He appeared to be uninjured, from that vantage point.  And the scene was not under control.
>
> Q. What was your objective when you arrived on that floor?
>
> A. To secure the scene, secure the people on the scene so that we could attempt to getting the patient back to the patient care area on the sixth floor.

. . . .

Q. Now, when you arrive onto the second floor, do you
   say anything to anyone?

A. Yes.

Q. What do you say?

A. As soon as I saw Jalia, she started towards me.  I
   told her she needed to leave.  She stated to me that
   she was going back to her father's room and I told
   her that she needed to leave and she said no.

. . . . .

Q. What did you do in response to her telling you "no"?

A. Told her she was under arrest.

Q. And then what happened next?

A. I attempted to take her into custody?

Q. What do you mean by that?

A. I attempted to grab her by the wrist and place
   handcuffs on her.

Dkt. No. 127 at 21:12–22, 23:13–22, 25:6–13, 26:14–20.

However, the jury in this case was not compelled to adopt Officer Keller's

version of these events.  *See, e.g.*, *Rucks v. City of N.Y.*, 96 F. Supp. 3d 138,

147 (S.D.N.Y. 2015) ("In deciding a motion under Rule 50, the Court must

disregard any evidence that weighs against the jury's verdict unless the jury

was required to believe it.").

Although Jalia did concede that other officers had told her to "leave" at an earlier point in the evening's events, *see, e.g.*, Dkt. No. 126 at 11:25–12:1, 26:1–8, she repeatedly testified that she did not have any conversation with Officer Keller in the short time between when he arrived in the elevator lobby area and when she was "tackled from behind and then arrested," *id*. at 4:1, 4:18–21, 5:8–10.  A surveillance video played at trial also tended to cast doubt on Officer Keller's assertion that he and Jalia engaged in any kind of back-and-forth before he initiated the arrest.

"[A] court may grant a motion for judgment as a matter of law 'only if it can conclude that, with credibility assessments made against the moving party and all inferences drawn against the moving party, a reasonable juror would have been *compelled* to accept the view of the moving party.'" *Zellner v. Summerlin*, 494 F.3d 344, 370–71 (2d Cir. 2007) (quoting *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993)).

Thus, for purposes of Rule 50(b), the jury rejected Officer Keller's testimony that he instructed or warned Jalia to leave before grabbing her arm and initiating the arrest.  And in his own testimony Officer Keller conceded that he did not speak with any of the other officers on the scene before he began to arrest Jalia, Dkt. No. 127 at 49:10–13, and he likewise conceded that none of the other law enforcement officials on the scene directed him to arrest her, *id*. at 51:20–52:2.

In sum, Officer Keller did not tell Jalia to leave before initiating his arrest for trespass.  And he had not received information from other officers that they had already told her to leave, either.  A person is not guilty of trespass on "premises which are at the time open to the public" unless "he defies a lawful order not to enter or remain."  N.Y. PENAL LAW § 140.05.  Because "no reasonably competent officer" in Officer Keller's position could have concluded, based on the facts known to him at the time, that probable cause existed to arrest Jalia, he is not entitled to qualified immunity.

In an effort to avoid this result, defendants argue that the "collective knowledge" doctrine fills in the gap.  According to defendants, Officer Keller could rely on the fact that Officer Jorgensen and Officer Nappo *already* told Jalia and the rest of the family that they would be arrested if they did not leave the hospital.  Defs.' Mem. at 13.

"Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation."  *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001).

Importantly, though, the doctrine does not eliminate the requirement that law enforcement officials have actually communicated with each other.  "The

collective knowledge doctrine allows for the imputation of knowledge between officers when one officer, having acquired probable cause, instructs another officer to conduct a search or arrest, even if the latter is far less informed." *United States v. Herron*, 18 F. Supp. 3d 214, 228 (E.D.N.Y. 2014). "In other words, the probable cause determination is based upon the actual knowledge of the officer who issued the instruction." *Id.*

Upon review, the collective knowledge doctrine does not apply because there was no instruction or communication that might bear on probable cause for trespass. After all, even Officer Keller conceded that he did not speak with the other officers on the scene before he began to arrest Jalia. Dkt. No. 127 at 49:10–13. He also conceded that none of the other officials on scene directed him to arrest her. *Id.* at 51:20–52:2.

Throughout the proceedings, Officer Keller has repeatedly hinted at the idea that his status as a law enforcement official gave him *carte blanche* to do whatever he deemed necessary to assert "control" over the situation in the elevator lobby. But the fact a situation is chaotic does not *ipso facto* mean that law enforcement can effect a warrantless arrest of someone who happens

to be present in a place where they otherwise possess a "license and privilege" to remain. [6]  N.Y. PENAL LAW § 140.05.

Indeed, defendants seem to be pressing the argument that because the situation was chaotic, Officer Keller necessarily had "arguable" probable cause to make an arrest.  But while the nature of the situation may have justified some *other* form of police intervention, the Second Circuit has repeatedly made clear that "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause." *Jenkins*, 478 F.3d at 87.

At the end of the day, "[i]f officers of reasonable competence would have agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Jenkins*, 478 F.3d at 87.  Because "no reasonably competent officer" could have concluded there was probable cause to arrest Jalia for

---

[6] "A defense of qualified immunity is not displaced by a violation of state law requirements." *Brown v. City of N.Y.*, 798 F.3d 94, 100 (2d Cir. 2015).  But in rejecting defendants' argument about collective knowledge, it is worth noting that simple trespass is only a "violation" under New York law.  N.Y. PENAL LAW § 140.05.  An officer may only make an arrest on a violation if he has "reasonable cause to believe such person has committed such offense in his or her presence."  N.Y. CRIM. PROC. LAW § 140.10(1)(a).

trespass, Officer Keller is not entitled to qualified immunity from her § 1983 false arrest claim.[7]

## 2. **Excessive Force**

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." *Moore*, 498 F. Supp. 3d at 352 (cleaned up).  "To succeed on a § 1983 excessive force claim, a plaintiff must show that the defendant's use of force was objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.*

This "objective reasonableness" inquiry is "necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Moore*, 498 F. Supp. 3d at 355–56 (cleaned up).  As relevant here, review is guided primarily by consideration of the so-called *Graham* factors: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of

---

[7] It has long been the law that "an unauthorized arrest will bar a charge of resisting arrest." *Sulkowska v. City of N.Y.*, 129 F. Supp. 2d 274, 290 (S.D.N.Y. 2001); *see also Curry v. City of Syracuse*, 315 F.3d 324, 336 (2d Cir. 2003) (noting same).  Because Officer Keller's assertion that probable cause existed for resisting arrest flowed from his attempt to arrest Jalia for trespass (as opposed to some other crime for which he might have obtained probable cause to arrest, either on the basis of his own knowledge or from information communicated to him by others at the scene), the analysis ends here.

the officer or others, and (3) whether the suspect was actively resisting or attempting to evade arrest by flight." *Id.*

At trial, Officer Keller recounted his decision to initiate an arrest of Jalia and what followed:

> Q. And then what happened next?
>
> A. I attempted to take her into custody.
>
> Q. What do you mean by that?
>
> A. I attempted to grab her by the wrist and place handcuffs on her.
>
> Q. I will show you some video here . . . . Can you tell the jury what's happening here?
>
> A. She is pulling her arm away from me.
>
> Q. And you have grasped onto her wrists at this point?
>
> A. Yes, I am.
>
> Q. The fact that she is pulling her arm away, what did you do in response to that?
>
> A. Put her in an escort or a come-along hold.  It's a defensive tactic.
>
> Q. What is a come-along hold?
>
> A. It's a hold that you can use for either an escort or can direct somebody to the floor.

Dkt. No. 127 at 26:16–27:8.

For her part, Jalia testified to a meaningfully different characterization of these events:

> Q. Did you touch any of the people who were on that floor, on the second floor?
>
> A. No.
>
> . . . .
>
> Q. And what happened when you tried to leave?
>
> A. Well, I was tackled from behind and then arrested.
>
> . . . .
>
> Q. Okay.  Now, are you aware of the fact that that was [Officer] Keller that was coming that way?
>
> A. I didn't know anyone was coming that way.
>
> Q. Did you have a conversation with him?
>
> A. No.
>
> Q. Did you see him coming?
>
> A. No.
>
> . . . .
>
> Q. Okay.  And did you have a chance to talk to [Officer] Keller before he threw you to the ground?
>
> A. No.
>
> Q. Do you know why you got thrown to the ground?

A. No.

Q. Do you remember what happened once you got
thrown to the ground?

A. All I remember is my sister getting thrown to the
floor, too.  And then my dad is still saying, "Help
me." And that was pretty much it.

Q. And do you remember being cuffed?

A. Yes.

Q. What happened after you were cuffed?

A. After I was cuffed, another officer was on top of me
keep me, I guess, still.

Dkt. No. 126 at 3:14–3:16, 3:25–4:1, 4:15–4:21, 5:8–5:22.

During cross-examination, Jalia adhered to her characterization of the
force used against her as something that "felt like a tackle" *id*. at 33:1–3,
before she "was rushed to the floor," *id*. at 33:8.  Although she did not testify
about any substantial injury, Jalia testified that it was "uncomfortable" to be
taken to the ground.  *Id*. at 38:13–14.  The surveillance video presented at
trial tended to corroborate her testimony.

After the close of the proof, the jury was instructed that an officer "may
only employ the amount of force reasonably necessary under the
circumstances."  Court's Ex. No. 3 at 33.  The instructions to the jury also
explained that:

> To determine whether one or more of the defendants deprived any of the plaintiffs of the right to be free from excessive force, you must determine whether the amount of force used to effect the arrest was that which a reasonable officer would have employed under similar circumstances.
>
> In making this determination, you may take into account such factors as the severity of the crime at issue, whether the plaintiff posed an immediate threat to the safety of the defendant or others, and whether the plaintiff actively resisted arrest or attempted to flee.

Court's Ex. No. 3 at 33–34.

Notably, the jury was cautioned that defendants were not obligated to use some less intrusive alternatives to force; rather, the instructions explained that defendants "need only to have acted within a range of conduct identified as reasonable." Court's Ex. No. 3 at 34. The jury ultimately found that Officer Keller used unreasonable force. Court's Ex. 6 at 13. However, the jury concluded that this force was not the proximate cause of any injury. *Id.*

Defendants contend that Officer Keller is entitled to qualified immunity from this claim because "Plaintiffs have never pointed to any existing precedent that exists which established that any reasonable officer in [Officer] Keller's shoes would have understood that he was violating Jalia's rights." Defs.' Mem. at 18.

"Qualified immunity is an affirmative defense on which the defendant has the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir.

2018).  As explained *supra*, the analysis can be broken down into three parts: (1) whether the plaintiff has established that the defendant violated a constitutional right; (2) if so, whether that right was "clearly established"; and (3) even if that right was "clearly established," whether it was still "objectively reasonable" for the officer to believe his conduct was lawful under the circumstances.  *Gonzalez*, 728 F.3d 149 at 154.

The jury answered the first question with a "yes" when it concluded that Officer Keller violated Jalia's constitutional right to be free from excessive force.  In reaching that conclusion, the jury was not compelled to adopt Officer Keller's version of the story; rather, it could and evidently did rely on Jalia's contrary testimony.

The second question is whether Jalia's right to be free from this use of force was "clearly established" at the time it occurred.  "To determine whether the relevant law was clearly established, [courts] consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (citation omitted).  However, even in the absence of a case directly on point, the law may still be considered clearly established if "decisions from this or other circuits clearly foreshadow a particular ruling on the issue." *Id*. (cleaned up).

Upon review, Jalia's constitutional right to be free from this use of force was also "clearly established."  Viewed through the lens of Rule 50(b), the evidence at trial established that Officer Keller arrived on the scene, grabbed Jalia's arm or wrist, and tackled her to the ground.  There was no indication that she posed any threat to safety, had actively resisted arrest at that time, or even attempted to flee.  Officer Keller simply arrived in the lobby behind Jalia, grabbed her wrist, and took her to the ground.

Under those factual circumstances, it is clearly established that the use of any force was inappropriate.  *Graham v. City of N.Y.*, 928 F. Supp. 2d 610, 618 (E.D.N.Y. 2013) ("Under the law, police are not permitted to use any degree of force in all instances—in some circumstances, no use of force is reasonable because none is required." (citation omitted); *see also Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010) (observing it is "well established" that "the use of entirely gratuitous force is unreasonable and therefore excessive").

To be clear, the evidence at trial established that Jalia was somewhat verbally abusive during this encounter; *i.e.*, she was screaming or yelling at the officers who were already present at the scene when Officer Keller came up behind her.  But that does not alter the conclusion.  *Jackson*, 236 F. Supp. 3d at 667 ("[I]t is clearly established that verbal objections to police actions do not warrant use of physical force.").

The final question in the analysis is whether it was nevertheless "objectively reasonable" for Officer Keller to believe his use of force was lawful. "Whether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact." *Zellner*, 494 F.3d at 367. On a Rule 50(b) motion in an excessive force case, the answer to this final question often overlaps with the "objective reasonableness" question posed to the jury. *Adedeji v. Holder*, 935 F. Supp. 2d 557, 570 (E.D.N.Y. 2013) (collecting cases); *see also Pub. Adm'r of Queens Cty. ex rel. Est. & Beneficiaries of Guzman v. City of N.Y.*, 2009 WL 498976, at *5 S.D.N.Y. Feb. 24, 2009) ("[T]he answer to either the qualified immunity or the Fourth Amendment question often resolves the other.").

That is true of this case. The jury considered what Officer Keller reasonably believed at the time he arrived on the scene in light of the Court's instructions about how to assess the reasonableness of any force he employed under the totality of the circumstances. Ultimately, the jury found that Officer Keller acted in an objectively unreasonable manner.

For Rule 50(b) purposes, this means that Officer Keller grabbed Jalia's arm from behind, "tackled" her to the ground, and stayed on top of her for a period of time in the complete absence of any *Graham*-based reason to do so. Plaintiffs' expert testified to substantially the same conclusion. *See generally* Ex. B to Kraus Aff., Dkt. No. 137-2. In short, the evidence that

supports the jury's finding of excessive force also serves to depict a factual scenario that made the use of any force clearly unlawful.  *Cf. Adedeji*, 935 F. Supp. 2d at 569–70.  Because "no reasonably competent officer" would have concluded that this force was warranted under the circumstances, Officer Keller is not entitled to qualified immunity from this claim.

## B.  **Plaintiffs' Post-Trial Motion**

Lise and Sabria argue that a new trial is warranted on their claims because the jury's verdict in favor of Officer Jorgensen and Officer Nappo was against the weight of the evidence.  Pls.' Mem., Dkt. No. 123-5 at 4, 7.  In plaintiffs' view, the evidence at trial failed to establish that a lawful order to leave the premises was communicated to either of them.  *Id.* at 5, 8.

"A grant of a new trial on the ground that the verdict was against the weight of the evidence is appropriate if 'the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.'"  *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 634 (2d Cir. 2002) (quoting *DLC Mgmt. Corp.*, 163 F.3d at 133).

Upon review, plaintiffs' motion for a new trial must be denied.  The reasonableness of most of defendants' conduct in the elevator lobby turned on whether (and when) certain verbal commands or warnings were given and on competing characterizations of the amount of force applied as the encounter

unfolded.  Although surveillance video was presented at trial, it did not include audio and the footage was of relatively low quality.

As a result, this case was mostly about how the jury chose to assess witness credibility.  Although on Rule 59 a court "may weigh the evidence and the credibility of the witnesses and need not view the evidence in the light most favorable to the verdict winner," *Raedle*, 670 F.3d at 418, it remains the case that a court "should rarely disturb a jury's evaluation of a witness's credibility," *DLC Mgmt. Corp.*, 163 F.3d at 134.

Measured against that standard, a new trial is not warranted on either Lise or Sabria's § 1983 claims.  As defendants emphasize in their opposition memorandum, the jury reached reasonable verdicts based on the competing testimony presented at trial.  "[T]he granting of a new trial is an extraordinary relief, and one is that is properly granted only upon a showing of exceptional circumstances." *Welch*, 871 F. Supp. 2d at 174 (cleaned up).  That standard has not been met.  Accordingly, plaintiffs' motion for a new trial will be denied.

## III.  <u>CONCLUSION</u>

The jury rendered a sensible verdict based on all of the evidence.  That verdict is broadly supported by the testimony of the witnesses and by the surveillance video shown at trial.  Because neither party has established any grounds for post-trial relief, the motions will be denied.

Therefore, it is

ORDERED that

1.  Defendants' motion for judgment as a matter of law is DENIED; and

2.  Plaintiffs' motion for a new trial is DENIED.

The Clerk of the Court is directed to terminate any pending motions and

close the file.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  September 7, 2021
        Utica, New York.